UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.　　　　　　　　　　　　　　Case No. 3:24-cr-191-WWB-SJH
　　　　　　　　　　　　　　　　18 U.S.C. § 1349
RENE MAURICIO ESCOBAR　　　　 18 U.S.C. § 371
JUANA NELIDA ESCOBAR

## INDICTMENT

The Grand Jury charges:

### COUNT ONE
### (Wire Fraud Conspiracy)

A. Introduction

At all times material to this Indictment:

1. Escobar Plastering, Inc. ("EP"), was a corporation registered with the Florida Department of State. EP was first registered on or about March 3, 2004. Records of the Florida Department of State reflected that EP's principal place of business was at 727 Woodvalley Way in Orlando, in the Middle District of Florida, and that the defendant RENE MAURICIO ESCOBAR was the president and registered agent of the corporation.

2. Under Florida law, any contractor or subcontractor who engages in any public or private construction must secure and maintain workers' compensation insurance. See Fla. Stat. §§ 440.10(1)(a) & 440.38(1). A contractor must require a

subcontractor to provide it with evidence that it has workers' compensation insurance for its workers. Fla. Stat. § 440.10(c). Failure to maintain workers' compensation insurance is a felony. Fla. Stat. § 440.105(4)(a) & (f).

3. Proof of workers' compensation insurance is generally provided in the form of a Certificate of Liability Insurance ("COI") declaring that the contractor or subcontractor has the insurance coverage. The certificate states only that the contractor or subcontractor has workers' compensation insurance and does not include the number of workers or the amount of payroll covered by the insurance policy.

B. Charge

From in or about December 2015 through in or about August 2024, in the Middle District of Florida, and elsewhere, the defendants,

RENE MAURICIO ESCOBAR,
JUANA NELIDA ESCOBAR,

did knowingly and intentionally, combine, conspire, confederate, and agree with each other and with other persons, known and unknown, to transmit and cause to be transmitted by wire in interstate commerce writings, signs, signals, pictures, sounds, and communications, having devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent representations concerning workers' compensation insurance, as more fully described

herein, for the purpose of executing such scheme and artifice and attempting to do so, in violation of 18 U.S.C. § 1343.

## C. Manner and Means

The manner and means by which the conspirators carried out the conspiracy and the scheme and artifice to defraud included, but were not limited to, the following:

1. On or about December 9, 2015, RENE ESCOBAR, on behalf of EP, caused to be submitted, by electronic transmission in interstate commerce, a Florida Workers Compensation Application to V3 Insurance Partners, LLC ("V3 Insurance"). The application represented that the workers' compensation insurance would cover an estimated total annual payroll of $60,000.

2. The submission of the workers' compensation insurance application caused V3 Insurance to issue a workers' compensation insurance policy to EP. The policy covered the period of December 9, 2015, to December 9, 2016. The estimated annual premium for the policy was approximately $6,474, which was based on the information provided in the application, including the estimated payroll to be covered.

3. In or about December 2016, RENE ESCOBAR caused the workers' compensation insurance policy with V3 Insurance to be renewed. The renewed policy covered the period of December 9, 2016, to December 9, 2017. The estimated annual premium for the policy was approximately $6,624, which was

based on the information provided in the December 2015 application, including the estimated payroll of $60,000.

4. On or about November 14, 2017, RENE ESCOBAR, on behalf of EP, caused to be submitted, by electronic transmission in interstate commerce, a Florida Workers Compensation Application to Markel Insurance Company ("Markel"). The application represented that the workers' compensation insurance would cover an estimated total annual payroll of $193,600.

5. The submission of the workers' compensation insurance application caused Markel to issue a workers' compensation insurance policy to EP. The policy covered the period of December 9, 2017, to December 9, 2018. The estimated annual premium for the policy was approximately $26,764, which was based on the information provided in the application, including the estimated payroll to be covered.

6. On or about November 14, 2018, RENE ESCOBAR, on behalf of EP, caused to be submitted, by electronic transmission in interstate commerce, a Florida Workers Compensation Application to V3 Insurance. The application represented that the workers' compensation insurance would cover an estimated total annual payroll of $215,000.

7. The submission of the workers' compensation insurance application caused V3 Insurance to issue a workers' compensation insurance policy to EP. The policy covered the period of December 9, 2018, to December 9, 2019. The

estimated annual premium for the policy was approximately $21,764, which was based on the information provided in the application, including the estimated payroll to be covered.

8.  In or about December 2019, RENE ESCOBAR caused the workers' compensation insurance policy with V3 Insurance to be renewed. The renewed policy covered the period of December 9, 2019, to December 9, 2020. The estimated annual premium for the policy was approximately $17,500, which was based on the information provided in the November 2018 application, including the estimated payroll of $215,000.

9.  In or about December 2020, RENE ESCOBAR caused the workers' compensation insurance policy with V3 Insurance to be renewed again. The renewed policy covered the period of December 9, 2020, to December 9, 2021. The estimated annual premium for the policy was approximately $19,649, which was based on the information provided in the November 2018 application, including the estimated payroll of $215,000.

10. On or about December 6, 2021, RENE ESCOBAR, on behalf of EP, caused to be submitted, by electronic transmission in interstate commerce, a Florida Workers Compensation Application to Frank Winston Crum Insurance. The application represented that the workers' compensation insurance would cover an estimated total annual payroll of $234,000.

11. The submission of the workers' compensation insurance application caused Benchmark Insurance Company ("Benchmark") to issue a workers' compensation insurance policy to EP. The policy covered the period of December 9, 2021, to December 9, 2022. The estimated annual premium for the policy was approximately $20,545, which was based on the information provided in the application, including the estimated payroll to be covered.

12. In or about December 2022, RENE ESCOBAR caused the workers' compensation insurance policy with Benchmark to be renewed. The renewed policy covered the period of December 9, 2022, to December 9, 2023. The estimated annual premium for the policy was approximately $19,814, which was based on the information provided in the December 2021 application, including the estimated payroll of $234,000.

13. In or about December 2023, RENE ESCOBAR caused the workers' compensation insurance policy with Benchmark to be renewed again. The renewed policy covered the period of December 9, 2023, to December 9, 2024. The estimated annual premium for the policy was approximately $17,806, which was based on the information provided in the December 2021 application, with some modifications, including an increase of the estimated payroll to $286,226.

14. Although the workers' compensation insurance premiums charged by the insurance companies were based on the limited payroll reflected in the workers' compensation insurance applications and reported by EP, the defendants "rented"

EP's workers' compensation insurance to numerous construction subcontractors located in the Middle District of Florida.

15. During the period of the conspiracy, the defendants provided, and caused to be provided, hundreds of COIs to construction contractors in the Middle District of Florida. Some of the COIs were provided by electronic transmission in interstate commerce. The purpose of providing the COIs to the contractors was to help carry out the scheme to defraud by falsely representing that the subcontractors worked for EP and therefore had workers' compensation insurance as required by Florida law. This false representation allowed the subcontractors to whom the defendants "rented" their workers' compensation insurance to obtain contracts with the construction contractors.

16. The contractors wrote payroll checks to EP for work performed by the subcontractors. The defendants deposited the payroll checks, or caused them to be deposited, into accounts at federally insured financial institutions.

17. During the period of the conspiracy, the defendants deposited and caused to be deposited more than 23,300 payroll checks totaling more than $146,100,000, of which the defendants retained approximately 7% to 8%, or a total of approximately $10,227,000 to $11,688,000, as a fee.

18. The defendants distributed the payroll remaining after deduction of the fee, and caused it to be distributed, to construction workers, usually through work

crew leaders. Many of the workers were undocumented aliens working illegally in the United States.

19. Although the insurance companies believed they were providing coverage for the limited payroll reflected in the workers' compensation insurance applications and reported by EP, the defendants' actions caused the insurance companies to unknowingly provide coverage for a total of more than $146,100,000 in payroll during the period of the conspiracy. If the insurance companies had known the amount of payroll they were in fact covering, they would have charged additional annual premiums totaling more than $15,250,000.

20. Neither EP nor the contractors nor the subcontractors provided adequate workers' compensation insurance for the workers.

21. The defendants' fraudulent scheme facilitated the concealment of the employment of undocumented aliens working illegally in the United States.

22. By funneling payroll through EP, the contractors and subcontractors could disclaim responsibility for ensuring (1) that adequate workers' compensation insurance was provided, (2) that required payroll taxes were paid, and (3) that the workers were legally authorized to work in the United States.

All in violation of 18 U.S.C. § 1349.

## COUNT TWO
### (Tax Fraud Conspiracy)

A. Introduction

Part A of Count One of this Indictment is realleged and incorporated herein.

B. Charge

From in or about December 2015 through in or about August 2024, in the Middle District of Florida, and elsewhere, the defendants,

RENE MAURICIO ESCOBAR,
JUANA NELIDA ESCOBAR,

did knowingly and willfully conspire, combine, confederate, and agree with other persons, known and unknown, to defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service ("IRS") in the ascertainment, computation, assessment, and collection of federal payroll taxes, specifically Federal Insurance Contributions Act ("FICA") taxes (Social Security tax and Medicare tax) and federal income tax.

C. Manner and Means

Part C of Count One of this Indictment is realleged and incorporated herein.

D. Overt Acts

In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed in the Middle District of Florida, and elsewhere:

1. In or about April 2016, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941, Employer's QUARTERLY Federal Tax Return ("Form 941"), for the quarter ending in March 2016, which reported that EP had two employees with total wages, tips, and other compensation of $15,400.

2. In or about July 2016, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in June 2016, which reported that EP had two employees with total wages, tips, and other compensation of $16,900.

3. In or about October 2016, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in September 2016, which reported that EP had two employees with total wages, tips, and other compensation of $18,200.

4. In or about January 2017, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in December 2016, which reported that EP had three employees with total wages, tips, and other compensation of $24,416.07.

5. In or about April 2017, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in March 2017, which reported that EP had three employees with total wages, tips, and other compensation of $23,400.

6. In or about July 2017, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in June 2017, which reported that EP had four employees with total wages, tips, and other compensation of $29,100.

7. In or about October 2017, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in September 2017, which reported that EP had seven employees with total wages, tips, and other compensation of $48,440.

8. In or about January 2018, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in December 2017, which reported that EP had nine employees with total wages, tips, and other compensation of $58,840.

9. In or about April 2018, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in March 2018, which reported that EP had two employees with total wages, tips, and other compensation of $48,780.

10. In or about July 2018, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in June 2018, which reported that EP had fourteen employees with total wages, tips, and other compensation of $64,160.

11. In or about October 2018, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in September 2018, which reported that EP had thirteen employees with total wages, tips, and other compensation of $65,460.

12. In or about January 2019, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in December 2018, which reported that EP had twelve employees with total wages, tips, and other compensation of $60,810.

13. In or about April 2019, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in March 2019, which reported that EP had ten employees with total wages, tips, and other compensation of $52,810.

14. In or about October 2019, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in September 2019, which reported that EP had eight employees with total wages, tips, and other compensation of $49,850.

15. In or about January 2020, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in December 2019, which reported that EP had eight employees with total wages, tips, and other compensation of $47,450.

16. In or about May 2020, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in March 2020, which reported that EP had eight employees with total wages, tips, and other compensation of $47,306.

17. In or about July 2020, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in June 2020, which reported that EP had seven employees with total wages, tips, and other compensation of $45,600.

18. In or about October 2020, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in September 2020, which reported that EP had nine employees with total wages, tips, and other compensation of $51,200.

19. In or about January 2021, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in December 2020, which reported that EP had eight employees with total wages, tips, and other compensation of $58,599.95.

20. In or about April 2021, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in March 2021, which reported that EP had nine employees with total wages, tips, and other compensation of $50,199.95.

21. In or about July 2021, the defendants filed and caused to be filed with the IRS, on behalf of EP, a Form 941 for the quarter ending in June 2021, which reported that EP had ten employees with total wages, tips, and other compensation of $69,500.

22. For the period of January 2015 through July 2021, EP reported to the IRS a total of approximately $1,064,558 in wages, tips, and other compensation to employees, from which approximately $249,172 in federal payroll taxes was deducted and paid to the IRS.

23. During the period of the conspiracy, the defendants deposited and caused to be deposited more than 23,300 payroll checks totaling more than $146,100,000.

24. Other than the tax payments made to the IRS on behalf of EP reflected in the Forms 941, neither EP nor the contractors nor the subcontractors paid either the workers' portion or the employers' portion of federal payroll taxes, such as for Medicare and Social Security, to the appropriate government authorities on the approximately $146,100,000 in payroll funneled through EP.

25. For the period of January 2015 through July 2021, the defendants caused a tax loss to the IRS in the total amount of at least approximately $25,374,916.

All in violation of 18 U.S.C. § 371.

## FORFEITURE

1. The allegations contained in Count One are incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

2. Upon conviction of a conspiracy to violate 18 U.S.C. § 1343, in violation of 18 U.S.C. § 1349, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

3. The property to be forfeited includes, but is not limited to, the following:

   a. an order of forfeiture for at least $10,227,000, which represents the proceeds the defendants obtained as a result of the conspiracy and scheme to defraud alleged in Count One.

   b. Real property, including all improvements thereon and appurtenances thereto, located at 9259 Eagles Perch Place, Orlando, Florida 32825, the legal description for which is:

   Lot 10, Eagles Landing at Rio Pinar, according to the plat thereof as recorded in Plat Book 106, Page 25, Public Records of Orange County, Florida

   Parcel Identification Number: 31-22-31-2300-00100

   Record Owners: Rene Mauricio Escobar and Juana Nelida Escobar Gomez;

   c. Real property, including all improvements thereon and appurtenances thereto, located at Hardwick Avenue, Orlando, Florida 32825, the legal description for which is:

A portion of Lot 11, Block H, Orlando Improvement Co. No. 3, according to the plat thereof as recorded in Plat Book S, Page 100, Public Records of Orange County, Florida, and being further described as follows:

Commencing at the Northeast corner of Lot 11, Block H, Orlando Improvement Co. No. 3, according to the plat thereof as recorded in Plat Book S, Page 100, Public Records of Orange County, Florida, said point being on the West Right of Way line of Hardwick Avenue, said Right of Way being 60 feet in width, thence continue South 00 degrees 00'00" West along said Right of Way a distance of 110.00 feet to the Point of Beginning, thence continue South 00 degrees 00'00" West along said Right of Way a distance of 20.00 feet, thence North 89 degrees 44'00" West a distance of 797.41 feet to the West line of Lot 11, Block H, thence North 00 degrees 07'00" East a distance of 130.00 feet to the Northwest corner of Lot 11, Block H, thence South 89 degrees 44'00" East a distance of 326.04 feet, thence South 00 degrees 00'00" East, a distance of 110 feet, thence South 89 degrees 44'00" East a distance of 471.13 feet to the Point of Beginning

Parcel Identification Number: 20-22-31-6352-08-113

Record Owners: Rene M. Escobar and Juana Nelida Escobar; and

d. Real property, including all improvements thereon and appurtenances thereto, located at 24348 S Thorn Creek Lane, Crete, Illinois 60417, the legal description for which is:

The East Half of the East Half (except the North Three Hundred Thirty (330) feet thereof) of the Southwest Quarter of Section Seven (7), Township Thirty Four (34) North, Range Fourteen (14) East of the Third Principal Meridian, except all that part thereof lying South of a line drawn from a point on the East line of said South West Quarter four hundred ninety five (495) feet South of the North East corner thereof, to a point on the West line of said East Half of the East Half of the South West Quarter Seven Hundred Eight (708) feet South of the North West corner thereof, in Will County, Illinois.

    Parcel Identification Number: 23-15-07-301-012-0000

    Record Owner: Juana Nelida Escobar.

4. If any of the property described above, as a result of any act or omission of the defendants:

  a. cannot be located upon the exercise of due diligence;

  b. has been transferred or sold to, or deposited with, a third party;

  c. has been placed beyond the jurisdiction of the court;

  d. has been substantially diminished in value; or

  e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).



ROGER B. HANDBERG
United States Attorney

By: _____
ARNOLD B. CORSMEIER
Assistant United States Attorney

By: _____
MICHAEL J. COOLICAN
Assistant United States Attorney
Deputy Chief, Jacksonville Division

# UNITED STATES DISTRICT COURT
Middle District of Florida
Jacksonville Division

THE UNITED STATES OF AMERICA

vs.

RENE MAURICIO ESCOBAR
JUANA NELIDA ESCOBAR

## INDICTMENT

Violations: 18 U.S.C. §§ 371 and 1349



Filed in open court this 28th day

of August, 2024.

_____
Clerk

Bail $_____